# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

JOHN A. PALMER,

       Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

       Defendant.

No. C05-4121-MWB

**REPORT AND RECOMMENDATION**

_____

## *TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . **2**

    A.    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    B.    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        1.    *Introductory facts and Palmer's hearing testimony* . . . . . . . . **3**
        2.    *Palmer's medical history* . . . . . . . . . . . . . . . . . . . . . . . . **6**
        3.    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . . **14**
        4.    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

III.   **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . **16**

    A.    *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **16**
    B.    *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . **19**

IV.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

V.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

# I. INTRODUCTION

The plaintiff John A. Palmer ("Palmer") appeals a decision by an administrative law judge ("ALJ") denying his applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Palmer claims the ALJ erred in failing to give appropriate weight to the opinions of his treating sources, and in finding his subjective complaints not to be fully credible. (*See* Doc. Nos. 9 & 11)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On May 29, 2001, Palmer protectively filed applications for DI and SSI benefits, alleging a disability onset date of April 19, 1998. (*See* R. 87-90, 384-87) Palmer claimed he was disabled due to pain in his left leg resulting from an injury that occurred when he was twelve years old. Palmer claimed the pain in his leg became unbearable whenever he was on his feet for more than three to four hours. (R. 146) Palmer's applications were denied initially and on reconsideration. Following a hearing (*see* R. 395-418), an ALJ ruled Palmer was not disabled. (*See* R. 47-61) Palmer appealed, and the Appeals Council remanded the matter for further evaluation of Palmer's subjective complaints and residual functional capacity. (*See* R. 16, 81-83).

On June 30, 2003, while the action was pending before the Appeals Council, Palmer filed new applications for DI and SSI benefits. (*See* R. 97-99, 391-94) A different ALJ joined the applications (*see* R. 17), and held a hearing on October 6, 2004. (R. 419-54) Palmer was represented at the hearing by attorney Warren L. Reimer. Palmer testified at the hearing, and Vocational Expert ("VE") William Tucker also testified. At the hearing, Palmer amended his alleged disability onset date to May 14, 2001, which corresponds with the date Palmer last worked. (*See* R. 16, 398) On January 18, 2005, the ALJ ruled Palmer was not disabled and not entitled to benefits. (R. 13-24) Palmer appealed the

ALJ's ruling, and on July 28, 2005, the Appeals Council denied Palmer's request for review (R. 5-7), making the ALJ's decision the final decision of the Commissioner.

Palmer filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 4) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Palmer's claim. Palmer filed a brief supporting his claim on January 23, 2006. (Doc. No. 9) The Commissioner filed a responsive brief on March 10, 2006 (Doc. No. 10), and Palmer filed a reply brief on March 20, 2006. (Doc. No. 11) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Palmer's claim for benefits.

### B. Factual Background

#### 1. Introductory facts and Palmer's hearing testimony

Palmer was born in 1956, making him forty-eight years old at the time of the hearing. He is 5'10" tall and weighs about 172 pounds. He is married. He finished the eleventh grade in school. He worked on getting a GED, but he never completed the course. (R. 426-27)

The last date when Palmer worked was May 14, 2001, when he was working as a tree trimmer. He stated the next morning when he woke up, he was in severe pain and he could not get out of bed. He has not worked since that time. Palmer is married. His wife works, and the couple survives on her income. (R. 427-28)

Palmer stated that during the past fifteen years, he has worked as a maintenance worker, hide handler, water softener servicer and installer, and tree trimmer. He did all of those jobs on a full-time basis. He also was a heavy equipment operator, but he held that job for only three weeks. Palmer does not believe he could return to any of his past

jobs due to the severity of pain he experiences in his lower back, left hip, and left leg. He stated the pain is constant, and activity makes it worse. For example, Palmer stated that when he saw doctors in Iowa City, they recommended he do a lot of walking to strengthen his leg, but when he tried to do much walking, his pain increased daily until he had to quit. He estimated he can walk half a mile before his pain becomes unbearable. (R. 428-33)

Palmer stated other activities also exacerbate his pain, including stooping, bending over, crouching, and squatting. He also has problems standing. When he stands at the kitchen sink, he leans on the counter and puts all of his weight onto his right leg to support himself. He can stand in this manner for up to a half hour, but if he stands on his right leg without support, then he can only stand for about ten minutes before he experiences severe pain and has to recline with his legs elevated for an hour or longer. (R. 433-36) When Palmer sits in an office-type chair, he has to stand up for a few minutes every half hour, and then he sits back down in a different position. (R. 436) Palmer has twelve stairs in his house, and he stated he can go up and down about four times a day, if he takes his time and supports himself using both hand rails. (R. 437) Palmer is not on any type of pain medication. His only medications are for high blood pressure. (*Id.*) Palmer took Celebrex for about three years, but even at increased dosages, the medication did not help his pain. (R. 442)

Palmer estimated he can lift no more than ten pounds. If he lifts anything heavier than that, he experiences a severe, sharp, stabbing pain in his lower back. (R. 436)

Palmer described his typical day. He has difficulty sleeping due to pain, and stated his "day starts at midnight." (R. 438) He is up until about 5:00 a.m., and then takes a nap for an hour or two, after which he is back up. He may go to bed about 10:00 p.m., but then he is up again after a few hours. Between midnight and 5:00 a.m., he sits in a recliner, walks around the house, lies on the couch, and tries to get comfortable. He estimated that in a twenty-four-hour period, he gets roughly four hours of sleep, which he

stated is not enough to keep him refreshed. During the day, he may do some dishes or pick things up around the house. He can do minor household chores for ten to fifteen minutes, and then he has to sit down for an hour and rest in his recliner with his legs up. On a ten-point scale, Palmer rated his pain in his lower back, left hip, and left leg at a 10. If he sits in his recliner and puts an ice pack on his lower back, the pain may reduce to a 7 on a ten-point scale. Then he will get up, move around the house again, and the pain rises back up to level 10. (R. 438-41) Palmer estimated he spends about an hour a day walking around his house, and about ten minutes standing at the kitchen counter. The rest of the time he spends lying down or sitting in his recliner with his feet elevated. He stated he does not sit in straight-backed chairs. The recliner is the most comfortable position for him, more comfortable than being in bed. (R. 441)

Palmer stated he used to enjoy hunting, fishing, and gardening, but he cannot do those activities now because of the walking, bending, and lifting involved. He currently has no hobbies. (R. 441-42)

Palmer stated he drinks one to two beers per day, which has been his routine since 2001. (R. 444) He denied ever abusing alcohol or ever having a drinking problem. (R. 445)

The ALJ asked Palmer about a comment in Dr. Liudahl's notes that he no longer wanted to treat Palmer. Palmer explained he and the doctor had a disagreement because Palmer was unable to get into an MRI machine. He indicated the doctor gave him Valium, but Palmer still was unable to get into the machine. Palmer asked to be sent to Mercy Medical Center for the MRI, because, according to Palmer, they would put him to sleep to do the test. Palmer stated Dr. Liudahl refused to send him to Mercy, Palmer insisted he had a right to go to Mercy if he wanted to, and he and the doctor parted ways over the argument. (*Id.*)

## 2.    Palmer's medical history

On March 18, 1997, Palmer was admitted to the hospital with complaints of recurring diarrhea and weight loss.  Records indicate Palmer was "a chronic alcoholic" and he admitted to drinking six to twelve beers daily.  (R. 237)  Records also indicate Palmer had "a history of Ethanol abuse in the past."  (R. 235)  An ultrasound showed pancreatic calcifications, and he had some blood in his stools.  Lab studies were negative. Doctors opined Palmer likely had "underlying pancreatic insufficiency causing the diarrhea."  (R. 243)  He was treated with IV hydration and a trial of Creon was prescribed.  He was discharged on March 20, 1997, on Creon.  (R. 243)

On May 22, 2001, Palmer was seen by his family doctor with complaints of bilateral hip pain and lower back pain, which Palmer rated at a 10 on a 10-point scale.  He had tried over-the-counter arthritis pills which had not relieved the pain.  He was referred to Kevin J. Liudahl, M.D., who directed him to see Leonel H. Herrera, M.D. for evaluation prior to seeing Dr. Liudahl.  (R. 258)

On June 5, 2001, Palmer underwent X-rays of his lumbar spine, pelvis, and left hip, to evaluate his complaints of bilateral hip pain.  The study showed evidence of a prior surgical repair of Palmer's left hip, with placement of a metal nail, side plate, and four screws that were still in place.  (Palmer apparently was injured in an automobile accident when he was twelve years old, resulting in a left femur fracture and placement of the hardware.  *See* R. 18.)  There was evidence of some loss of normal lumbar lordosis, which the radiologist opined could be secondary to some muscle spasm.  Otherwise, the studies were normal.  (R. 248)

On June 13, 2001, Palmer went to the emergency room complaining of bilateral low back pain radiating into both hips.  He was diagnosed with a chronic bilateral sacroiliac joint sprain.  He was treated with injections of a Kenalog and Marcaine mixture.  (R. 249-51)

On July 3, 2001, Palmer was seen by Leonel H. Herrera, M.D. for evaluation and treatment of his left hip, left leg, and low back pain. Palmer stated the injections he received in the hospital had helped his back pain, but had not provided any relief of his left hip and leg pain. Palmer expressed concern regarding possible rejection of the hardware in his hip. He indicated he had had pain in his hip ever since his accident. Dr. Herrera's notes indicate Palmer "states he plans on going on disability and is wondering how long the hip will go before it falls apart." (R. 255) The doctor encouraged Palmer to be as active as possible to increase his strength gradually. He expressly did not place any lifting limitations on Palmer. He referred Palmer to Kevin J. Liudahl, M.D., a hip specialist, for further evaluation. Dr. Herrera's diagnostic impressions were "1. Degenerative joint disease, degenerative disc disease - lumbar spine. 2. Chronic sacroiliac ligamentous sprain – improved with sacroiliac joint injections. 3. History of fracture of the left femur with resultant intermedullary nail placement. 4. Suspect depression. 5. Suspect excessive alcohol use." (*Id.*) Dr. Herrera advised Palmer to "continue with his home exercise program with no need for any further follow-up with [this doctor]." (*Id.*)

On July 12, 2001, Palmer saw Dr. Liudahl for evaluation of his complaints of left hip pain and low back pain. Palmer had mildly decreased range of motion of his lumbar spine with some pain radiating down his legs at the extremes of extension. He also had some hip tenderness. X-rays showed "minimal if any hip space narrowing," and "a fair amount of lumbar spine arthritis." (R. 283) Dr. Liudahl directed Palmer to continue with "the usual conservative measures and anti-inflammatories." (*Id.*) He ordered lumbar facet injections for Palmer, which were administered on July 17, 2001. (R. 252-54) The injections relieved Palmer's pain for only about three days, and then the pain returned in both legs with some numbness and tingling. Dr. Liudahl ordered an MRI scan to rule out stenosis and disc herniation. (R. 282)

Palmer called Dr. Liudahl's office on July 30, 2001, to report that when he appeared for his MRI on July 27, 2001, he had "suffered a severe anxiety attack" as he was going into the MRI machine, and the scan was canceled. He wanted to reschedule the MRI scan with "some sort of sedation." Dr. Liudahl ordered 10 mg of Valium prior to the next scan, and the scan was rescheduled. (*Id.*) Palmer apparently attempted the MRI on several more occasions with Valium, but was never able to complete the scan. Dr. Liudahl recommended that Palmer go to Omaha for an MRI, but Palmer refused on the basis that it would be too expensive. Palmer asked to be scheduled for an MRI at Mercy, where he could be intubated and sedated. Dr. Liudahl recommended Palmer be referred to another orthopedic doctor. (R. 281-82)

On September 7, 2001, Palmer saw Thomas M. Chopp, M.D. at The Center for Neurosciences, Orthopaedics & Spine, for evaluation of his mid and low back pain. Dr. Chopp ordered an MRI scan with the assistance of anesthesia. He directed Palmer to take nonsteroidal anti-inflammatory medications as needed, and recommended Palmer try Celebrex. He prescribed physical therapy to strengthen Palmer's low back. He limited Palmer's lifting to five pounds maximum for six weeks. (R. 279-80)

Palmer returned to see Dr. Chopp for follow-up on October 16, 2001. He complained of ongoing pain in his mid-back, and left buttock pain extending down the posterior and lateral aspect of his thigh to just above the knee. He had no pain below knee level. Dr. Chopp noted the MRI of Palmer's thoracic spine had shown "some irregularity of the end plates from T6 to T12, possibly associated with old apophysitis," and MRI of his lumbar spine showed "left L4 neural foraminal stenosis secondary to a mild bulging disc." (R. 277-78) Dr. Chopp diagnosed Palmer with "[m]inimal herniated nucleus pulposus with possible impingement on the L4 nerve root." (R. 278) He recommended Palmer obtain a neurosurgery consult for further evaluation. He prescribed Celebrex, and directed Palmer to avoid any prolonged stooping, bending, or lifting. (*Id.*)

On November 16, 2001, Palmer received a lumbar epidural steroid injection at the Mercy Pain Management Center. Doctors started Palmer on Neurontin 100 mg three times daily, and increased his Celebrex to 200 mg twice daily for one week, after which he was directed to lower the dosage to 200 mg once daily. (R. 285-86) Palmer received three to four days of good relief from the injection. He had another injection on December 19, 2001. (R. 289)

On January 23, 2002, Palmer saw his family doctor with complaints of increased low back pain. The doctor prescribed Ultracet to be taken only at night pending follow-up at the Pain Clinic. (R. 299)

On July 24, 2002, Palmer underwent a whole body bone scan to evaluate his ongoing low back and left leg pain. The scan showed no abnormal activity of Palmer's left hip, pelvis, or lumbar spine that would correlate with his symptoms of ongoing pain. The scan also showed "Grade I increased activity at the superolateral margin of the right orbit by projection believed anterior. Possibly old traumatic site." (R. 298)

On January 29, 2003, Palmer underwent a multi-system evaluation at the University of Iowa Hospitals and Clinics, in connection with his complaints of pain in his lower back and left leg. (*See* R. 361-83) Palmer stated his leg and hip pain varied in distribution and intensity. Palmer stated he could walk for three to four blocks before he had to stop due to leg pain. He stated his leg pain was worse when he extended his back. Palmer indicated his health had worsened somewhat over the preceding year. He was limiting his activities due to pain, which he stated was present all of the time. He stated he could lift only light objects, and he could not walk or sit for more than ten minutes at a time, or stand for more than thirty minutes at a time. He indicated pain always interrupted his sleep. Palmer also indicated he had stopped smoking recently, and he drank alcohol beverages "occasionally." (R. 361-62) Upon examination, Palmer's low back motion was noted to be "completely normal." (R. 364) He had very little hip pain on range of

motion. He exhibited some local tenderness in the lateral aspect of his left thigh. Review of Palmer's x-rays and MRI scans indicated he had "some very, very mild degenerative changes of the disc at L4/5," but no other abnormalities. (R. 364-65) Doctors found no pathology in Palmer's back to account for his left leg pain. They opined his old hardware could be causing some of the pain in his left thigh. They explained the hardware could be removed, but they could offer only a 50% chance this would improve Palmer's symptoms, and it actually could worsen his symptoms. Doctors opined Palmer's low back pain was "primarily mechanical and muscular in nature." (R. 364) They encouraged him to return to his activities as tolerated, and to take Ibuprofen as needed for his leg pain.

With regard to Palmer's other systems, he was noted to have a "[n]ew diagnosis of hypertension," and elevated cholesterol levels. (R. 370) He was scheduled for a sleep study to evaluate him for sleep apnea, in connection with his complaints of shortness of breath, severe headache, and fatigue during the day. (*Id.*) He was encouraged to make an ophthalmology appoint to check his vision. (R. 572) He had some elevated liver function test results, and he was scheduled for a liver ultrasound and biopsy.

On March 19, 2003, Palmer was seen at the University of Iowa with complaints of increasing left buttock and lateral thigh pain. He was taking Celebrex and aspirin for pain. The doctor recommended Palmer participate in a multi-disciplinary rehabilitation program, and Palmer was receptive to the idea. (R. 346-47)

On May 14, 2003, Palmer underwent a Rehabilitation Evaluation by the University of Iowa Back Care Team. (R. 337-45) Palmer gave a history of his childhood injury and placement of the hardware in his leg/hip. He stated he had experienced leg pain since then, but had been able to tolerate the pain and work. He stated he had injured his back in May 2001, while cutting trees, and since that time, the combination of his back and leg pain had prevented him from working full-time. The Back Care Team found Palmer's subjective complaints to be fully credible. Joseph J. Chen, M.D. noted it was his, and the

team's, opinion that Palmer had "been unable to pursue gainful employment on an eight hour per day or 40 hour per week basis over the last two years, . . . based on severe pain secondary to a back injury and also a significant flare-up of the left hip fracture." (R. 338) Dr. Chen stated the combination of those two significant problems had severely limited Palmer's activity level. He opined that after "appropriate rehabilitation," if Palmer could work in a job that allowed him to control his time and take short breaks a needed, Palmer would be able to return to "at least 3/4 employment" over a four- to five-month period. (*Id.*) The team recommended a two-week program of rehabilitation involving daily exercise of thirty to forty-five minutes per day, complete smoking cessation, and only moderate caffeine consumption. (R. 345) They gave Palmer current restrictions of lifting no more than forty-five pounds occasionally and twenty-five pounds frequently, for a maximum of two hours per day; occasional bending, reaching, and stooping, for a maximum of four hours per day; sitting for no more than forty minutes at a time without taking a five-minute break to stand, move about, and change position; and standing in one position for no more than thirty minutes at a time without taking a five-minute break to move around, change position, and stretch. (R. 338)

Palmer also underwent a psychological evaluation as part of his rehabilitation evaluation. (R. 335-36) Valerie J. Keffala, Ph.D. found no psychological diagnosis. She instructed Palmer in some breathing exercises for stress and pain management, and gave him brochures on managing chronic pain and stress. (*Id.*)

On June 9, 2003, Palmer was seen at the University of Iowa to begin "an outpatient comprehensive multidisciplinary pain rehabilitation program." (R. 331-32) He participated in physical therapy, training in coping skills and relaxation, and vocational counseling. (*Id.*) On day two of the program, Palmer reported no change in his pain level, and no concerns were noted by the team. (R. 329-30) On day three, Palmer noted he was having trouble sleeping and his leg pain was worse. Doctors reassured Palmer that

some muscle soreness was to be expected as his muscles strengthened. Amitriptyline was prescribed to help Palmer sleep. (R. 328-29) Palmer's pain was better on day four of the program, and he reported sleeping well on the Amitriptyline. (R. 327-28) On day five, Palmer reported increased pain and not sleeping well the previous night. His Amitriptyline dosage was increased. Palmer planned to walk around outdoors over the weekend to see if his pain flared up. (R. 325-26) When Palmer returned for day six of the program, on June 16, 2003, he reported increased pain; however, he had walked around over the weekend with no flare-up of his back pain. Palmer asked about pain medications, and notes indicate he received counseling about "appropriate use of medications and avoidance of narcotics for chronic back pain." (R. 323)

Palmer met with Dr. Chen on June 17, 2003, and reported his left leg pain was worse. He did not participate in physical therapy, taking the day off due to his pain. (R. 321) He received an injection that relieved his pain almost completely immediately post-injection. (R. 319) Dr. Chen's notes indicate Palmer was convinced that his pain would not improve until his hardware was removed, although x-rays did not show any significant complication with the hardware. Dr. Chen consulted with a hip surgeon at the University of Iowa, who opined removal of the hardware likely would improve Palmer's symptoms. (R. 319) However, notes from a later visit, in September 2003, indicate the hip surgeon had stated "the risks far outweigh the benefits of removing stable mature hardware." (R. 314)

Palmer did not continue with the rehabilitation program. A summary of his progress during the six days he participated in the program indicates he planned to seek further medical intervention. The team felt Palmer had the potential to improve his aerobic capacity and decrease his cardiovascular risk profile. The team recommended Palmer continue with a program of aerobic training, strengthening, and weight loss exercise; keep an exercise log; and discontinue smoking. (R. 318)

On June 27, 2003, Dr. Chen imposed the following limitations on Palmer: lift up to forty-five pounds occasionally and twenty-two pounds frequently; limit sustained physical activity to no more than one to one-and-a-half hours at a time; only occasional bending, reaching, and stooping, up to a maximum of one-and-a-half hours of sustained activity. In addition to continuing his exercises, Palmer was encouraged to continue working on coping skills and a stress management approach to his overall pain management. (R. 317)

Palmer saw Dr. Chen for follow-up on July 24, 2003, and received another injection. The doctor advised Palmer he could have an injection three to four times per year. (R. 316)

On August 12, 2003, Lawrence F. Staples, M.D. reviewed the record and completed a Residual Functional Capacity Assessment form regarding Palmer. (R. 351-60) Dr. Staples opined Palmer could lift up to twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for about six hours in an eight-hour workday; perform all types of postural activities occasionally; and push/pull without limitation. Dr. Staples indicated the record contained no treating or examining source statement regarding Palmer's physical capacities, suggesting he did not have available for review the report from Palmer's rehabilitation program or Dr. Chen's office notes.

On September 25, 2003, Palmer called Dr. Chen's office to report he had fallen down "while taking his puppies for a walk." (R. 315) He reported his pain level was "beyond a 10." (*Id.*) He was scheduled to see Dr. Chen in a few days, and was advised to use ice and take an extra Celebrex for pain. (*Id.*) Palmer saw Dr. Chen on September 30, 2003, by which time the increased pain from his fall apparently had subsided. Dr. Chen's notes indicate Palmer was "in no apparent distress," and his condition basically was unchanged from his last exam. Dr. Chen recommended Palmer continue with his exercise program, even if he experienced mild to moderate increase in

his chronic pain.  He recommended Palmer not pursue surgical options, which Dr. Chen felt could aggravate Palmer's condition.  He opined Palmer should "continue focusing on functional activities."  (R. 314)

### 3.    *Vocational expert's testimony*

The ALJ asked VE William Tucker to consider an individual who can lift ten pounds frequently and twenty pounds occasionally; stand for thirty minutes at a time, for a total of two hours in an eight-hour workday; sit for one hour at a time, for a total of six hours in an eight-hour workday; is able to climb stairs; and must alternate position from sitting to standing every thirty minutes.  The VE stated with those restrictions, the individual could not return to any of Palmer's past relevant work, all of which was considered heavy work.  The VE also indicated an individual with Palmer's work history would have no transferable skills.

However, the VE indicated an individual of Palmer's age, and with Palmer's education and work experience, with the limitations set forth above, would be able to perform other light, unskilled jobs that allowed him to alternate sitting and standing.  The VE gave examples of production assembler, inspector and hand packager, and marker or labeler, all of which exist in sufficient numbers in Iowa and the national economy. (R. 446-47)

The ALJ then asked the VE to consider an individual who can lift five pounds frequently and ten pounds occasionally; stand for thirty minutes at a time, for a total of two hours in an eight-hour workday; sit for one hour at a time, for a total of six hours in an eight-hour workday; must alternate between sitting and standing every thirty minutes; may climb stairs occasionally; and occasionally must elevate his feet.  The VE stated addition of the requirement that the individual be able to elevate his feet would preclude competitive

employment. The VE noted "elevating the feet is probably an accommodation that would not normally be tolerated in a competitive employment situation." (R. 447)

Palmer's attorney asked the VE to consider an individual with the same restrictions as stated in the ALJ's second hypothetical, except to eliminate the requirement that the individual be able to elevate his feet occasionally. The VE indicated the reduced lifting limitation in the second hypothetical would contemplate only sedentary work, and the requirement that the individual be able to alternate his position every thirty minutes probably would eliminate even sedentary work. (R. 447-48)

### 4.    *The ALJ's decision*

The ALJ found Palmer has not engaged in substantial gainful activity since his alleged disability onset date of May 14, 2001. He found Palmer has severe impairments consisting of "status-post left femoral neck fracture and sciatica" (R. 18), which do not rise to the Listing level of severity. (R. 23, ¶ 4)

The ALJ found Palmer's descriptions of his daily activities not to be as limiting as would be expected if Palmer's complaints of disabling symptoms and limitations were considered fully credible. He noted Palmer had failed to follow his treating doctors' recommendations on occasion, and found this suggested Palmer's symptoms "may not have been as serious as alleged." (R. 21) The ALJ observed that Palmer's subjective pain complaints were basically the same both before and after his alleged disability onset date, yet the impairment had not prevented Palmer from working prior to that date. (*Id.*)

The ALJ gave "some weight" to Dr. Chen's opinion regarding Palmer's functional restrictions, but he appears to have given greater weight to the opinions of the consulting physicians, which the ALJ found to support a conclusion that Palmer is not disabled. (*Id.*) The ALJ found Palmer "retains the residual functional capacity to occasionally lift 20 pounds and frequently lift 10 pounds; stand 30 minutes at a time for 2 hours in an 8 hour

work day; sit 1 hour at a time for 6 hours in an 8 hour work day; alternate between standing and sitting every 30 minutes; and occasionally climb stairs." (*Id.*)

The ALJ found Palmer's residual functional capacity would not allow him to return to his past relevant work. However, the ALJ further found Palmer could perform the full range of sedentary work. (R. 22-23) He therefore concluded Palmer was not disabled at any time through the date of the ALJ's decision (*i.e.*, January 18, 2005). (R. 23)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her

physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though

the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is

substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations

are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)    the claimant's daily activities;
> 2)    the duration, frequency and intensity of the pain;
> 3)    precipitating and aggravating factors;
> 4)    dosage, effectiveness and side effects of medication;
> 5)    functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. ANALYSIS

Palmer argues the ALJ erred in failing to grant controlling weight to Dr. Chen's opinion regarding his functional abilities, and in failing to explain the minimal weight he gave to Dr. Chen's opinion. The Commissioner points out that Dr. Chen did not begin to treat Palmer until May 2003, two years after Palmer's alleged disability onset date. The Commissioner argues that prior to seeing Dr. Chen, none of Palmer's treating sources had ever offered an opinion that Palmer's functional limitations would render him unable to work, and they consistently recommended that Palmer engage in exercise and physical activity. However, the court notes the Commissioner never requested a treating source statement regarding Palmer's ability to work from the other treating sources. The lack of notations in the treatment notes regarding work restrictions cannot constitute substantial evidence in the record to support a finding that Palmer is not disabled. *See Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006).

When a treating physician's opinion regarding a claimant's functional capacity is supported by objective medical evidence in the record, the treating physician's opinion is entitled to substantial weight and is given special deference under the Social Security regulations. *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000); *Wiekamp v. Apfel*, 116 F. Supp. 2d. 1056, 1063-64 (N.D. Iowa 2000) (Bennett, C.J.). Here, the ALJ failed to note any manner in which Dr. Chen's opinions were not supported by the objective medical evidence. Indeed, his opinion regarding Palmer's functional capacity was rendered after an extensive and thorough evaluation of Palmer, and six days during which Palmer participated in a rehabilitation program. The court finds significant Dr. Chen's opinion that even if Palmer had completed the rehabilitation program, he could only have been expected to return to "3/4 employment."

Considering the ALJ's two hypothetical questions, the VE's testimony, and the ALJ's residual functional capacity findings, there appears to be a very, very fine line

between finding Palmer can work and finding he is disabled. Indeed, based on the evidence of record, this determination appears to hinge on whether Palmer can lift five pounds frequently and ten pounds occasionally, or ten pounds frequently and twenty pounds occasionally. In the ALJ's assessment of Palmer's residual functional capacity, the ALJ accepted that Palmer must be able to change his position frequently, alternating between sitting and standing every thirty minutes. The VE stated that with this restriction, and the 5/10 pound lifting limitation, even sedentary work would be precluded. Given the nature of Palmer's subjective pain complaints and the impairments he claims are disabling, the court finds the difference between a 10/20 pound and a 5/10 pound lifting limitation to be of little significance. Far more significant in this case is Palmer's inability to sit for more than thirty minutes at a time without having to change position, and the requirement that he be able to elevate his feet at least occasionally during the day. The court finds Palmer's testimony to be credible with regard to these two limitations, and further finds the record supports his claim that he can must change positions quite frequently and elevate his feet to relieve his pain. The VE testified these limitations would preclude even sedentary work.

Considering the evidence as a whole, the court finds the record does not contain substantial evidence to support the ALJ's determination that Palmer is not disabled. The record contains consistent, substantial evidence that Palmer suffers from disabling pain, that he has sought treatment on an ongoing basis since his alleged disability onset date, and that he is, in fact, disabled.

## V. CONCLUSION

Accordingly, **IT IS RESPECTFULLY RECOMMENDED**, for the reasons discussed above, unless any party files objections[1] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for calculation and award of benefits.

**IT IS SO ORDERED.**

**DATED** this 9th day of June, 2006.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[1]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).